TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
LAUREN RESTREPO (Cal. Bar No. 319873)
MAXWELL K. COLL (Cal. Bar No. 312651)
Assistant United States Attorneys
National Security Division
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1785 / 3825
    Email:    maxwell.coll@usdoj.gov
              lauren.restrepo@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 25-CR-333-AB |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RYAN MITCHEL KRAMER; EXHIBITS |
| v. | |
| RYAN MITCHELL KRAMER, | Hearing Date: April 17, 2026 |
| Defendant. | Hearing Time: 1:00 p.m. |
| | Location:    Courtroom of the Hon. André Birotte Jr. |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Lauren Restrepo and Maxwell Coll, hereby files its Sentencing Position for defendant Ryan Mitchell Kramer in the above-captioned case.

The Government's Sentencing Position is based upon the attached memorandum of points and authorities and exhibits, the files and

records in this case, and such further evidence and argument as the Court may permit.

Dated: April 10, 2026          Respectfully submitted,

                               TODD BLANCHE
                               Acting Attorney General

                               BILAL A. ESSAYLI
                               First Assistant United States Attorney

                               IAN V. YANNIELLO
                               Assistant United States Attorney

                               _____/s/_____
                               LAUREN RESTREPO
                               MAXWELL K. COLL
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

In early 2024, victim M.V., a Walt Disney Company ("Disney") employee, downloaded a malicious file that he believed was computer software able to create A.I.-generated art.  The malicious file gave defendant access to M.V.'s personal computer, including passwords for various of M.V.'s personal and Disney work accounts.  Defendant then accessed and downloaded M.V.'s private banking, medical, and personal information, and over a terabyte of data from thousands of Disney Slack channels which he later publicly released on numerous online platforms after trying to repeatedly extort M.V.

Defendant pleaded guilty, pursuant to a plea agreement, to one count of violation of 18 U.S.C. § 1030(a)(2)(C) related to his hack of Disney's accounts and one count of violation of 18 U.S.C. § 1030(a)(7) related to his hack of M.V.'s computer and accounts.

As detailed below, the government respectfully requests that the Court impose the following sentence: (i) 27 months' imprisonment; (ii) a two-year term of supervised release; and (iii) a mandatory special assessment of $200.

**II.    STATEMENT OF FACTS**

As set forth in paragraphs 12-16 of the Presentence Investigation Report ("PSR"), in early 2024, defendant posted a malware file on various online platforms that, when downloaded, enabled defendant to gain access to victims' computers without their knowledge.  Defendant admits that at least three victims downloaded his malicious file, and that he gained unauthorized access to their computers and accounts.

One of those victims was M.V.  Sometime in April-May 2024, M.V. downloaded the malicious file that defendant posted, and defendant thereby gained access to M.V.'s personal computer, including an online account where M.V. stored the login credentials and passwords for his personal and work accounts.  Through hacking M.V.'s computer, defendant also gained access to M.V.'s private banking, medical, and personal information and records, which he downloaded.

After gaining unauthorized access to M.V.'s computer, online accounts, and personal information, defendant began accessing additional accounts, including a Slack account that M.V. used as an employee of Disney.  By accessing M.V.'s Disney Slack account, defendant gained access to thousands of non-public Disney Slack channels, and in May 2024, he downloaded approximately 1.1 terabytes of confidential data from those thousands of Disney Slack channels, including, among other things, conversations among Disney employees about ongoing projects, as well as documents and files shared among employees, including non-public information related to various released and unreleased Disney projects.

With this proverbial treasure trove of stolen data, defendant set out to extort M.V.  In July 2024, defendant contacted M.V. via email and Discord pretending to be a member of a fake Russia-based hacktivist group called "NullBulge."  The emails and Discord messages contained threats to leak M.V.'s personal information and Disney's Slack data if defendant's demands were not met.  One message defendant sent to M.V. on July 8, 2024, threatened that in order to "ensure this information remains undisclosed, I need your cooperation," and warned that if M.V. contacted anyone about the message, "we will drop our data publicly and loudly without so much

as a warning."  Defendant also threatened that this would be a "major, major mistake" for M.V.'s "information and career at Disney." Another email sent to M.V. with the subject line "You sure that's how you want to play?", stated, in part, "Respond, do what we want, or end up on the net. Your choice. We will not contact you again."

A few days later, after M.V. did not respond to defendant's threats, defendant publicly released information from the thousands of Slack channels he stole from Disney, as well as M.V.'s private bank, medical, and personal records.  Defendant's extortionist attempts did not stop there.  On July 14, 2024, following the leak of M.V.'s and Disney's data, M.V. received a final demand from defendant that stated, in part, "just wanted to check in to see if you believe us now. We are willing to take your data down, but not for free. Let us know."  M.V. never responded to defendant's demands.  As detailed further below, the damage to Disney caused by defendant's public release of non-public information from thousands of company Slack channels was substantial.

**III. THE PRESENTENCE INVESTIGATION REPORT AND USPO RECOMMENDATION**

On December 15, 2025, the USPO disclosed the PSR and its Recommendation Letter.  (Dkts. 25-26.)  The USPO found that defendant's total offense level was 21, based on the following calculations:

| Base Offense Level: | 6 | USSG §§ 2B1.1(a)(2) |
|---|---|---|
| Specific Offense Characteristics: | | |
| Loss Amount More Than $1.5 But Less Than $3.5 million | +16 | USSG §§ 2B1.1(b)(1)(I) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(10)(C) |
| Offense Under 18 U.S.C. § 1030 | +2 | USSG § 2B1.1(b)(18) |
| Acceptance of Responsibility: | -3 | USSG § 3E1.1(a)-(b) |

| Zero Point Offender | -2 | USSG § 4C1.1(a)(1)-(11) |
| --- | --- | --- |

The government concurs with the USPO's calculation of a Total Offense Level of 21 and a Criminal History Category of I, which corresponds to a Guidelines range of 37-46 months.

The government respectfully requests that the Court adopt the factual findings and calculations of the PSR in this matter and the additional factual information contained in this sentencing position.

### A.   16-level Enhancement for Loss Amount Between $1.5-$3.5 Million

The government concurs with the USPO's analysis that a 16-level enhancement under USSG § 2B1.1(b)(1)(I) applies in this case because the loss amount is between $1.5-$3.5 million.

Section 1030 defines "loss" broadly in subsection (e)(11) as meaning "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

Under USSG § 2B1.1(b)(1), the word loss is not defined in the guideline itself, but the notes accompanying 2B1.1(b)(1) and the later commentary to the guideline provide guidance.  The notes to the loss table at § 2B1.1.(b)(1) state that "loss is the greater of actual loss or intended loss."  USSG § 2B1.1(b)(1), n.3(A).  The notes go on to define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. n.3(C)(i). Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money" and "does not include emotional distress, harm

4

to reputation, or other non-economic harm." Id. n.3(C)(iii).

Reasonably foreseeable pecuniary harm "means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id. n.3(C)(iv).

In addition, Application Note 3(A) to § 2B1.1 provides additional guidance and commentary to help determine loss in computer intrusion cases and states, in relevant part, "reasonably foreseeable pecuniary harm shall be considered to *include* the pecuniary harm specified . . . as follows:

> In the case of an offense under 18 U.S.C. § 1030, actual loss *includes* the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable: any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of interruption of service.

USSG § 2B1.1, Application Note 3(A)(iii) (emphasis added).

As courts have noted, use of the word "includes" in Application Note 3(A) indicates the loss described in that provision should be considered in addition to actual loss, as defined under 2B1.1(b)(1), n.3(A)-(C).  See United States v. Musacchio, 590 F. App'x 359, 365 (5th Cir. 2014).  Nothing in Application Note 3(A) suggests it replaces or limits the general process for calculating loss outlined in § 2B1.1(b)(1), n.3(A)-(C).  The Sentencing Commission's report is consistent with this interpretation.  According to the report, Application Note 3(A)(v)(III) was "designed to *more fully* account for specific factors relevant to computer offenses."  U.S. Sentencing Comm'n, Report to the Congress: Increased Penalties for Cyber Security Offenses (2003) (emphasis added).  As noted in Musacchio,

"the addition of Note 3(A)(v)(III) was necessary because the costs described in that provision otherwise would not have been included in the loss unless they were reasonably foreseeable." 590 F. App'x at 365. Thus, under 2B1.1(b), loss includes both foreseeable harm as well as the costs listed in Note 3(A)(v)(III). See id. (citing United States v. Schuster, 467 F.3d 614 (7th Cir. 2006).

Courts have repeatedly found that loss suffered by a victim company or institution investigating or responding to a defendant's fraud or breach can be included in the loss calculation for sentencing purposes.[1] See United States v. Nosal, 2014 WL 121519, at *4 (N.D. Cal. Jan. 13, 2014) (Noting that "actual loss" includes those costs incurred as part of an internal investigation reasonably necessary to respond to the offense); United States v. Candrick, 435 F. App'x 404, 406 (5th Cir. 2011) (loss calculation properly included fees that defendant's former employer paid to notify clients of security breach caused by defendant's offense); United States v. DeRosier, 501 F.3d 888, 895-96 & n.11 (8th Cir. 2007) (costs incurred by an victim bank for investigating defendant could be included in loss because the investigation was in immediate response to defendant's fraudulent conduct). The reason for this broad definition of loss under § 2B1.1 is because loss calculations used to

---

[1] However, note that the Supreme Court in Lagos v. United States provided a critical distinction between how loss is calculated under the sentencing Guidelines versus how restitution is calculated and mandated for victims under the Mandatory Victims Restitution Act ("MVRA"). In Lagos, the court found that the MVRA does not cover the costs of a private investigation that the victim chooses on its own to conduct. Lagos v. United States, 584 U.S. 577 (2018). Given this distinction, the government requests that a separate restitution hearing be set after defendant's sentencing.

determine a defendant's sentencing Guidelines range are meant to encompass the scope and magnitude of the harm caused by a defendant's conduct. See Nosal, 2014 WL 121519, at *6 ("The very purpose of the "loss" enhancement to a Guideline offense level is that the reasonably foreseeable loss caused by an offender's actions represents a proxy for that offender's culpability." (citation omitted)). Indeed, that is why an intended loss figure can be used for Guidelines purposes, even if it is significantly greater than actual loss, in order to accurately "measure the magnitude of the crime at the time it was committed." United States v. Ostmeyer, 100 F. App'x 820, 822 (10th Cir. 2004) (citation omitted).

As detailed above, defendant repeatedly threatened M.V. that he would release the stolen data if M.V. did not comply with his demands. Defendant knew the value of the information he possessed, and the harm its release would cause, warning M.V. that telling others about defendant's demands would be a "major, major mistake" for M.V.'s "information and career at Disney." Even after he posted the information on numerous platforms, defendant was well aware of the continuing damage he was causing, writing to M.V. "just wanted to check in to see if you believe us now. We are willing to take your data down, but not for free. Let us know."

Disney is a multinational mass media and entertainment conglomerate with a current market capitalization of over $175 billion. Review of Disney's public information shows it has offices around the globe, and its numerous business divisions include theme parks, cruise lines, movies, and television.[2] Defendant publicly

---

[2] See https://privacy.thewaltdisneycompany.com/en/company-overview/

released over a terabyte of confidential Slack data from thousands of nonpublic company Slack Channels.  It was unquestionably foreseeable to defendant that the public release of such a massive tranche of information would cause substantial monetary damage to the company and would require significant investigation and effort to respond to the breach.  The high value of this information was why defendant believed he could extort M.V. for money.

Exhibits 1 and 2, filed under seal, outline in significant detail the costs incurred by Disney because of defendant's conduct.  Disney outlined the various executive, global, technical, and legal teams required to respond to the breach and leak of data; it provided invoices from outside venders, incident response teams, and outside counsel; it provided spreadsheets of the titles, estimated time, and hourly rates for each Disney employee who worked to respond to the leak; and it detailed its methodology in calculating the loss figures.  Importantly, it also noted costs that were explicitly not included in its calculation, including any work performed to aid the government.  What's more, it limited its loss calculation to work done during the four-month period immediately following the breach, even though additional work was completed beyond that time frame. After assembling this information, Disney determined that a conservative estimate of the loss it suffered because of the breach and data leak was approximately $2.3 million ($2,319,780.26). (Exhibit 1 at p. 5.)  Again, defendant released over a terabyte of nonpublic data from thousands of internal business Slack Channels for a multibillion-dollar global entertainment company.  Given the volume of data leaked, from thousands of different Slack channels and business streams, a cost of $2.3 million to Disney for responding to

this incident is both reasonable and reasonably foreseeable.  But even if the Court were to discount this conservative calculation by 30%, a 16-level enhancement would still apply because the loss would be over $1.5 million.  A 16-level enhancement under USSG § 2B1.1(b)(1)(I) should therefore apply.

> **B.   Two-Level Enhancement Because Offense Involved Sophisticated Means**

As stipulated by the parties in the plea agreement, a two-level enhancement under USSG § 2B1.1(b)(10)(C) applies because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Application Note 9(B) defines the term "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Defendant's use of malware and his efforts to conceal his identity meet this standard.  He engaged in a deliberate scheme wherein he distributed malware disguised as legitimate AI software on trusted online platforms, gained unauthorized access to the victims' devices and accounts, and exploited that access to obtain non-public information.  Online, and in communications with victims, defendant concealed his conduct and identity by pretended to be a member of a fake Russia-based hacktivist group called "NullBulge" and used this moniker on multiple online platforms to threaten disclosure of victim information.  Accordingly, a two-level increase is applicable under USSG § 2B1.1(b)(10)(C).

### C.    Two-Level Enhancement for § 1030 Offense

As stipulated by the parties in the plea agreement, a two-level enhancement applies under USSG § 2B1.1(b)(18) if (A) the defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information.  Here, defendant pleaded guilty to Counts 1 and 2 of the Information, which are offenses under 18 U.S.C. § 1030(a)(2)(C) and (a)(7).  What's more, the offenses involved the unauthorized public dissemination of personal information.  Accordingly, the two-level increase is appropriate.

## IV.    GOVERNMENT'S SENTENCING RECOMMENDATION

In its Recommendation Letter, the USPO recommended the following sentence: (i) 37 months' imprisonment; (ii) a two-year term of supervised release; and (iii) a mandatory special assessment of $200.

The government concurs with the USPO's recommendation of a two-year term of supervised release under the terms and conditions outlined in the USPO's Recommendation Letter and the parties' plea agreement (Dkt. 4), as well as the imposition of a mandatory special assessment of $200.  However, for the reasons outlined below, and in accordance with the factors set forth in 18 U.S.C. § 3553(a), the government recommends that the Court impose a sentence of 27 months' imprisonment.

### A.    The Nature, Circumstances, and Seriousness of the Offense, and the Need to Provide Just Punishment, Warrant a 27-month Custodial Sentence

The nature and circumstances of defendant's offense -- in particular, the harm he caused to the victims -- was significant.

10

Defendant posted malware on public forums that enabled him to gain access to victims' computers.  By his own admission, using this malware he hacked the computers of multiple victims.  In the case of Victim M.V., defendant gained access to M.V.'s personal computer, including an online account where M.V. stored login credentials and passwords.  Defendant used this access to not only obtain M.V.'s private bank, medical, and personal records, but also to download approximately 1.1 terabytes of confidential data from thousands of Disney Slack channels.

If that were not enough, defendant used the stolen data and information as a weapon to extort M.V.  As detailed above, he sent multiple threatening and harassing messages, including threatening that if M.V. contacted anyone about the messages that defendant would "drop" the "data publicly and loudly without so much as a warning." Defendant also threatened M.V.'s job, saying that contacting anyone would be a "major, major mistake" for M.V.'s "information and career at Disney."  Thus, defendant was all too aware of the substantial damage that would be caused to M.V. and Disney if this information was released.  When M.V. did not immediately give in to defendant's demands, defendant sent yet another email, this time with the subject line "You sure that's how you want to play?", and that stated, in part, "Respond, do what we want, or end up on the net. Your choice."

When M.V. refused to respond to defendant's extortionate demands, defendant made good on his threats and publicly released the 1.1 terabytes of stolen Disney Slack records, as well as M.V.'s private bank, medical, and personal information, on multiple online platforms.  And he did not stop there.  Even after publicly releasing this information, defendant attempted to extort M.V. one last time,

11

sending a final email stating, "just wanted to check in to see if you believe us now. We are willing to take your data down, but not for free. Let us know."  Defendant clearly understood the value of the information he released and the value of it being taken down as quickly as possible.  And defendant was right.  As outlined above, the release of the information was harmful and costly to Disney; indeed, the information's high value is exactly why defendant sent the threats and extortionate demands in the first place.

Defendant's conduct was deceitful, profit-driven, sophisticated, and persistent; it warrants a significant custodial sentence.

**B.    General and Specific Deterrence and the Need to Promote Respect for the Law Also Compel a Meaningful Custodial Sentence**

A meaningful prison sentence of 27 months is also necessary to provide adequate deterrence -- both specific and general -- against further criminal conduct. See 18 U.S.C. § 3553(a)(2)(B).   Here, the Court should fashion a sentence for defendant that will deter him from future criminal conduct, as well as send a strong message to others who are involved in cybercrime, that they will be punished with a significant term in federal prison.  By his own admission defendant conducted cyber intrusions against multiple victims and he threatened to disclose sensitive data for his own personal gain; and he followed through with those threats when his demands were not met. These crimes required careful calculation and deliberation.  This conduct was not a mistake, a poor decision in the heat of the moment, or an aberration.  This conduct calls for a sentence to deter defendant and others from future criminal activity.

Moreover, the public's interest in deterrence is particularly acute in cases like this given the ever-increasing costs of

cybercrime and extortion, including the ability to release massive amounts of sensitive and confidential information with the click of a button.  In 2024, the Internet Crime Complaint Center (IC3), the FBI unit that receives and tracks cybercrime complaints from victims, received a total of 86,415 complaints related to cyber extortions alone, with reported losses at over $143 million.[3]  These figures highlight the tremendous costs incurred by victims because victims must expend considerable resources to identify the full scope of the breach and fix any vulnerabilities, ensure the protection of sensitive data, notify clients, and, in many cases, report and respond to federal and state regulatory agencies in the aftermath of a breach.

Moreover, the need for general deterrence is greatest in cases involving schemes that "may easily go undetected and unpunished." United States v. McQueen, 727 F.3d 1144, 1158-59 (11th Cir. 2013) (reversing lenient sentence because it "sap[ped] the goal of general deterrence," which is one of the "'key purposes of sentencing'"); see also United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010) (explaining that because tax evasion offenses are infrequently prosecuted, "[w]ithout a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path"); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish,

---

[3] See, Federal Bureau of Investigation, 2024 Internet Crime Report, at 20-21, available at https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf

since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

Investigations of cyber intrusions are challenging, as law enforcement and companies must work quickly to collect and preserve data, analyze that data to attribute the breach to the perpetrator, and then successfully locate and apprehend that individual.  Like defendant, cybercriminals use increasingly sophisticated tools and techniques to obfuscate their true identities, and their infrastructure is frequently scattered across multiple jurisdictions.  Consequently, the importance of affording general deterrence through meaningful sentences is particularly acute in cyber cases: where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

A substantial sentence sends a message that even if the likelihood of being apprehended is not substantial, the consequences of such conduct will be.  By contrast, a too lenient sentence would do little to dissuade defendant or others from committing a similar crime in the future.

**C.    The History and Characteristics of Defendant Also Support the Government's Recommended Sentence**

Defendant's own history and characteristics include both mitigating and aggravating circumstances.  In mitigation, defendant is 26 years old, has no prior criminal history, has maintained consistent employment over the past year, and appears to have done well on pretrial release.  He agreed to resolve this case quickly via Information, saving the government valuable time and resources and the victims the strain of a prolonged prosecution and trial.  As discussed further in defendant's under seal sentencing filing,

14

defendant also suffered from various mental health issues growing up that may have contributed to his conduct in this case.  That said, defendant was raised in a stable home and is privileged to have continued family support.  As noted in the PSR, he does not appear to have drug abuse problems or significant mental health issues.  The combination of these advantages make him unlike many of the defendants that come before this Court who have committed crimes owed -- at least in part -- to one or more of these factors.  For those defendants, such factors may not exonerate but can certainly mitigate their criminal conduct.  By contrast, consideration of these factors makes defendant's criminal conduct in this case less excusable.  This is not the case of a defendant driven to drug sales at a young age because of an unstable homelife.  This is also not the case of a defendant driven to criminal behavior due to overwhelming drug addiction.  Defendant's conduct was driven by greed and a callous disregard for the consequences of his actions and the harm it could cause.  For these reasons, a meaningful custodial sentence is appropriate.

Accordingly, the government submits that a sentence of 27 months imprisonment and a two year term of supervised release under the terms and conditions proposed by the USPO and agreed to by the parties -- including the Computer Monitoring Program -- strikes an appropriate balance between the seriousness and breadth of the offenses and the need to deter other cybercriminals, on the one hand, and defendant's specific history and particular circumstances, on the other.

**D.    Restitution**

Pursuant to 18 U.S.C. § 3663A, restitution to victims is mandatory in this case.  The Mandatory Victims Restitution Act also provides that "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."  18 U.S.C. § 3664(d)(5).  The government respectfully requests that the Court set a restitution hearing within 90 days of defendant's sentencing to determine the applicable restitution amounts due to victims.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: 27 months' imprisonment, followed by two years of supervised release, and the mandatory special assessment of $200.